08-1306 Presenius USA v. Baxter Intl 08-1306 May it please the court, Juanita Brooks on behalf of Presenius USA and Presenius Medical Care. Your Honor, in this matter Are these patents in re-exam now? Yes, they are, Your Honor. What's the status? Is it an ex parte or inter parte? It's an ex parte, Your Honor, and the status is that two are on final rejection, the 131 and the 436 and the 027. There has been a substantial new question of patentability found. But they stand rejected as part of their first office action? Pardon me, Your Honor? Are they final or they stand rejected as part of the first office action? How far along are the other patents? Two of the patents are on final rejection. And the others? The 027 has been entered into re-exam and there's been a substantial new question of patentability found and a first office action. And that's where it stands. And they have all been based on the prior art that was submitted to the jury in this matter. In this case, Your Honor, it's after a lengthy jury trial. But what happens in this case if we were to find that some, the jury probably found that some of these claims were obvious, but we found that the JMO was proper as to others. Did all of the accused products violate all of the claims? What's the situation? The situation, Your Honor, is that there was an injunction entered on a particular product, which is the hemodialysis 2008K machine, which will go into effect as of January 1, 2009. In the interim, there has been a running royalty ordered, which we also discussed in our brief, of 1,000 times more than what the jury awarded at the damaged space. But that doesn't answer my question. My question is, suppose we were to say that some of the claims are obvious and some aren't. Where does that leave us? Where it leaves us is it depends on which claims you're talking about, Your Honor. If it is that all of the touchscreen claims are indeed obvious, then the reason that the 2008K was found to be infringing is because it had a touchscreen on it. And so if Your Honor's find that the jury was correct in their initial verdict. Did the jury find that this product infringed each one of the claims? No, the jury found the opposite. The jury found that all the patents were obvious. No, no, I understand. But did the jury address the question of infringement as apart from obviousness? The jury addressed the question of infringement on another patent that is no longer at issue in the case, the 476 patent. There were two claims asserted by Baxter where Fresenius raised a non-infringement defense, and the jury, in fact, found that that patent was not infringed. There was a stipulation, wasn't there, regarding the 2008K product that all the elements of the alleged claims were met on the 434, 131, and 027? That's correct, Your Honor, and that was based on the court's claim construction, which is also raised in our brief. So if, in fact, Your Honor's find that the court was incorrect in the court's claim construction, we then have additional non-infringement arguments that we were not provided at trial because of the court's claim construction. Is there a question of waiver in the claim construction, then? We don't believe so, Your Honor. It was very clear. There was a letter that was written to the court, and the letter said specifically that based upon the court's claim construction, Fresenius will stipulate that all of the elements in the asserted claims can be found in the accused product. It was based only on the court's claim construction. That was made very clear at the time. Well, in your statement of the issues 4 and 5, you've indicated that the limitation of 434, Claim 26, to include only a bare microprocessor, and that your fifth issue is a time variable profile limitation on the 131 patent. What about the 027? On the 027, excuse me, Your Honor. Is that totally waived at that point for the 027? On the 027, we are not raising any additional claim constructions because the only claim that's remaining on the 027 was Claim 11, which was simply adding a touchscreen to a hemodialysis machine. And therefore, that one we are obviously asserting is obvious. So you're saying you did not waive your claim construction? That's correct, Your Honor. I just want to be clear. The stipulation of infringement, did that cover each of the claims as to which there's an obviousness issue? No, Your Honor. I covered the 434 and the 131. It did not cover the 476, but that is no longer before the court since Baxter dropped it. So every claim as to which there's an obviousness issue was also stipulated that it infringed? Correct, Your Honor, under the course of claim construction. And all three claims? And all three patents? Correct, Your Honor. So to return to what happened. It strikes me. I think we know what happened. It strikes me that you've got a problem here and that you just didn't do the job at trial that you needed to do in some respects. And help me take, for example, the question of this stepper motor, which is a requirement of some of these claims. I'm having difficulty understanding where there is testimony that the stepper motor was present in the prior art. I believe Mr. Cousy's testimony, and he makes reference to the manual, but the manual doesn't identify the stepper motor by name. So I don't know how the jury is supposed to figure out that that picture is a stepper motor. So, Your Honor, it's referring, for example, to 434 patent claim 30, which is a means plus function claim that requires both a microprocessor and a stepper motor. Right. Mr. Cousy did indeed testify in detail that in his... No, he didn't testify in detail. He testified that these elements were present in the prior art. But the question is, you know, he makes reference to the manual, but the manual doesn't identify a stepper motor, does it? It actually identifies, Your Honor, at appendix 20009, both pepper and syringe, which is what the stepper motor is for. What page? 20009. Which volume? That would be volume 2. When did that page become 200... 20009, Your Honor. Okay, so where's the reference to the stepper motor? It specifically discloses the syringe, the plunger, and a motor system. It does not use the term stepper motor, but that is simply a motor that drives the heparin pump to deliver the anticoagulants... It's a particular kind of motor, right? Pardon me, Your Honor? A particular kind of motor, isn't it? It is a motor that functions in exactly the same way as... No, no, no. The answer is it's a particular kind of motor. Not every motor is a stepper motor. That's correct, Your Honor. I don't know how the jury is supposed to figure out from this that this is a stepper motor. It just says there's a motor that drives the heparin pump. It doesn't need to just be a stepper motor, Your Honor. It can also be an equivalent, and the purpose of the structure, the function of the structure, was to deliver heparin to the patient. There had been an admission by the inventor for Baxter, Mr. Kelly, that the delivery of heparin, which is an anticoagulant, was a common feature of every hemodialysis machine. So there must be a way to get the heparin to the patient. The code describes in detail, and it's only at page 3 of the manual, so... But nobody ever addressed the equivalence issue either, right? What he addressed was that it was in the code manual. He didn't say the code manual shows a motor which is the equivalent of a stepper motor, right? He didn't say those magic words, no, Your Honor. Well, it's not a question of magic words. It's a question of what the jury's supposed to understand. You've got a problem. I understand what the court is saying. We believe, however, this jury was properly instructed. They were given, at Appendix 203 and 204, literally a roadmap of every piece of prior art and how it fit with each of the claims. Mr. Causey stepped the jury through each of the elements of each of the claims and how they could be found in the prior art. The manuals themselves were in evidence. They weren't lengthy manuals. It wasn't the case where there were thousands of pages before the jury. This was on page 3 of the manual that the jury had in evidence before it. I don't understand how the jury's supposed to understand that it's a stepper motor unless somebody tells them it's a stepper motor. What they understood was that it was a motor that was used to drive the heparin syringe so that the heparin could get to the patient. That's all this claim requires. There's nothing terribly sophisticated about it. The structure was simply a microprocessor. And in this case, the court found stepper motor. But it is essentially a motor that is going to drive the syringe so that the heparin can get to the patient. But even so, how is a jury supposed to take a look at the manuals? We only had a specific portion of the manuals in the appendices. And you take those and you look at them, even with some understanding of a dialysis machine, it's still very difficult unless all of the pieces are put together for a jury to understand what the elements of the claims require versus the evidence which is submitted. Isn't there a problem there in tying it together? You can't just throw the kitchen sink in there and say, well, here it is, folks, you figure it out all by yourselves. You still need to have some clarity and some specificity with regard to the evidence which is submitted to the jury. Absolutely, Your Honor. And that's what we believe happened in this case. We absolutely did that. We started with Dr. Lips, who was one of the inventors of one piece of prior art, the serotron. It went from there to Mr. Ragsdale, who actually helped create the serotron and testified as an expert. It went from there to Mr. Ferris, the individual that worked at Elo Graphics, the company where the Baxter inventors purchased the touchscreen that they integrated onto their device. It went from there to Dr. Ward, who actually demonstrated one of the prior art machines in front of the jury. And it went from there to Mr. Causey, who then essentially summed up what the jury had just spent over a week listening to. And he directed them to specific places in the manuals. And within one or two pages of those places are all of the other requirements. And so essentially what he did was he summarized what the jury had already heard, not just from our witnesses, but from Baxter's own witness and his own admissions. And interestingly, if you look at Baxter's red brief on page 8, this is what the jury believed and this is what the jury was told. That all hemodialysis machines must be capable of monitoring and adjusting numerous parameters, including temperature, arterial and venous pressure, sodium concentration, dialysate acidity, ultrafiltration rate, and anticoagulant infusion rate, based on the needs of individual patients. All hemodialysis machines. And that all Baxter's patented invention was, was it disclosed better control, operation, and monitoring of these required treatments through a touchscreen. That's what this case was all about. Baxter said that to the jury. Baxter said that to this court. The jury took him at face value. And so we did not spend an inordinate amount of time going through what Baxter had said was required of every hemodialysis machine. Instead, we called the question. And the question was, would it have been obvious to one of skill in the art to add a touchscreen to all of these requirements that must be in a hemodialysis machine for hemodialysis to actually be performed? And the answer by the jury was unequivocally yes. But it was more than just a touchscreen, wasn't it? Because prior to this, you had all of the pieces in the prior art, but the combination of the touchscreen is what really made the improvement. That is correct. And there was some secondary evidence to the fact that once a touchscreen was placed in, the quality of the hemodialysis process improved. That is certainly what Baxter put forth. We countered that with the fact that Fresenius had a non-touchscreen hemodialysis machine on the market at the same time that outperformed and outsold Baxter's tenfold. But the bottom line is that the jury makes that weight. The jury makes that credibility determination. Provided that there's sufficient information before the jury, which is clear to them, and not just thrown into a bag and saying, you pull the bag out and you figure out where the pieces belong. Obviously, you've got a caudilloscope, which you can turn, make perfect pictures, if you know how to turn it and how to put it together. You still have to give the jury the specific information, which is required to turn the caudilloscope in order to make a good picture so they can see it. Absolutely, Your Honor. And that is what we contend that we did in this case. Baxter is not saying that there's a failure proof here, that we failed to put into evidence certain prior art that then would meet some of the elements. Or what happened in Coedo, where a piece of prior art is introduced into evidence and then, according to the court, it is literally never mentioned again. We didn't have that. We had three pieces of prior art. The code, the CMSOA, and the serotron that sat literally in front of the jury the entire time. We have the manuals that went into evidence. Yeah, but the problem with the way you're describing it and the way you describe it in the brief, it's too general. You know, there's specific limitations in these claims. And the district court found on J. Moore, and the argument is that some of those limitations were not established to be present in the prior art. That's your problem. And the stepper motor is one example. There may be a couple others. And, you know, the question is, are we going to take very generalized testimony and find that that's sufficient to establish that everything other than the touch screen was present in the prior art? And, Your Honor, my response to that is no. You don't have to do that because that's not what happened in this case. If you just look at Mr. Pazzi's sort of summation that came after all these other witnesses, there may be parts where it sounds conclusory because, indeed, he was reaching a conclusion. But the jury had already heard in detail from Dr. Lips and Mr. Ragsdale how the serotron functioned. The jury had already heard in detail from Dr. Ward how the CMSOA functioned. The jury heard in detail about other prior art medical devices with touch screens and how they worked. Mr. Pazzi himself had actually put a touch screen on a medical device. The jury heard all about the SARMS 9000, which is a heart-lung machine that performs very much the same function as a hemodialysis machine. It takes over for body parts while you're being operated on, and it circulates the blood. It had a touch screen on it. This was nothing new or novel or really very complex. You're not really addressing my problem. Let's assume that you established that the addition of a touch screen to a hemodialysis machine was obvious. Okay, let's accept that hypothetically for the moment. There are some other limitations here where you didn't dot the I's and cross the T's. That's your problem. Saying that there was generalized testimony, there were machines present, that's all well and good, but we've got to find in the record where there was enough for the jury to find that those limitations were present. Your Honor, I would be happy to do that as quickly as I could, although I believe my time may be almost up. But in our brief, we take each and every claim and each and every element. If you just start with the first one, Claim 131, Claim 1 of the 131, it's simply a dialysate delivery system for supplying dialysate to a hemodialyzer consisting of one of four things, a dialysate preparation unit, a dialysate circulation unit, an ultrafiltration removal unit, or a dialysate monitoring unit. Every witness testified, if you don't have dialysate and you can't circulate it, you can't perform hemodialysis. And so we had witness after witness talking about this very element and document after document showing how the prior art did it. We have Baxter admitting in their brief, it has to do it. If you go to the second part of that claim, it's simply adding a touchscreen on a hemodialysis machine that circulates a dialyzer. If you go to Claim 2, it's adding a touchscreen that has a button and so on. So if we forget all of the touchscreen claims and just go to the claims that involve basic hemodialysis, let's look at the 434 Claim 26. It's a means for controlling a dialysate parameter such as dialysate temperature or dialysate concentration and a means for delivering the dialysate in the hemodialysis machine. Again, every hemodialysis machine had to perform that function. So then the question is, in order to perform that function, did they do it with the corresponding structure? And the answer is the corresponding structure is simply a microprocessor. And every witness testified that each of the machines before the jury had microprocessors. The Serotron was the first computer-controlled hemodialysis machine ever. And that was testified to clearly and unequivocally by Dr. Lipps. The next was that every witness testified that there had to be a means for delivering the dialysate. And that was simply through a microprocessor and a pump. And so while I understand what Your Honor's concern is that we failed to dot the I's and cross the T's, we actually did. We may not have done it in a ritualistic fashion of having the witness then say, you know, and did you see this means within this hemodialysis machine? Yes, I saw it right here. It's not ritualistic. It's the essence of the kind of case you're supposed to make. That's your problem. You keep referring to it as ritualistic or magic numbers. It isn't. We've got to look at the record. We've got to find in the record that there was enough for the jury to make the conclusion that it did. Understood, Your Honor. And what I'm saying is there was. We have citation after citation of either documentation that was before the jury, documentation that was thoroughly discussed by the experts that testified, expert testimony and admissions of Baxter's inventor that support each and every one of these claims. And so we do have that. And that's what we're saying. I agree with Your Honor. We're not trying to short circuit what is required in a patent case. And neither is Baxter saying that we did not introduce prior art that covered each and every element. What they're saying is that the expert's testimony or what the district court said is that it was confusing or it was generalized. The jury, the properly instructed jury, did not find that. That properly instructed jury made credibility determinations, weighed the evidence, which is their province. But then that finding was given no deference by the district court. But then the question really is whether or not the district court, who was present there and reviewed all of the evidence, along with the jury, instructed the jury, came up with a JMAL, which gives me pause because basically what you're saying is even though she was there, she did review the particular evidence which was submitted and she found it in fault. You're asking us to go back through and reanalyze it, figure out exactly what was presented to the jury. And then reverse the JMAL on that basis. I think that's a tough hill to climb because you really need, as Judge Dyke points out, you really need to cross the T's and dot the I's. I think COITO requires that and I think it's necessary, at least for the jury, to understand each and every element which you're saying is in the claim. And if you don't take the roadmap and give it to the jury so that they can follow it, they could wander all over the place and come up with nothing except that they've taken the wrong road. I think you can respond to Judge Garrison and then we need to move on. Thank you, Your Honor. I understood, Your Honor. But what happened is that the district court didn't simply find that as a matter of law the jury was wrong. Instead, the district court specifically found that the jury's verdict was owed no deference because obviousness was simply a question of law, failing to consider that it was also a question of fact. Gave that verdict no deference and then substituted the district court's opinion in lieu of the jury's. And we're not asking the court to reinvent the wheel and go back through the record. We've done it for the court in our briefs. Every element is there. Mr. Cossie, Dr. Ward, Mr. Ferris, and Mr. Ragsdale all did the same thing for the jury too at the trial. Thank you. That's it for Mr. Lee. And would you enlarge Mr. Lee's time by the amount we've run over? If you need it. Thank you, Your Honor. May it please the court. My name is Bill Lee, and together with my partner, Jonathan Cedarbaum, I represent the appellee and cross appellants, Baxter International and Baxter Health Care. To address at the outset some questions put to Ms. Brooks, the- Let me ask you a hypothetical so I know where we are. You're not going to like the hypothetical, but we'll deal with it anyway. The hypothetical is let's assume we agree that the jury's verdict about adding the touch screen was supported by substantial evidence that they could find that that was obvious to add the touch screen. Let's assume that. What other elements in these claims did they fail to show were in the prior art? Your Honor, let's take the claim that you were talking about with Ms. Brooks. Can you give me a list just to start off so we know what- Yeah, I think claim seven of the 027 patent, for sure. Claim 11, which is dependent upon claim seven of the 027 patent, for sure. In the 434 patent, claim 26, claim 30, claim 31. Then I think it's a little bit harder to answer, Your Honor, for the 131 because the portions that are in dispute are actually portions that discuss the aspects of the touch screen. If I take Your Honor's hypothetical and if the touch screen has all of the aspects of the touch screen that were claimed in the 131, it becomes a harder question to answer. When you go to the 131 and you get to the touch screen portion of the claims, they are talking not just about any touch screen, but they're talking about touch screens that allow you to input, receive output, and display time variable profiles. If Your Honor considers the 131 patent, that is an important aspect of the touch screen. I think for the first two that I've said, the 027 and the 434, there are portions of the claims themselves that describe aspects completely independent of the touch screen, as to which there was not just a failure proof, it's just not there. As to claim seven, that was raised in the JAMAL motion only in a footnote, right? Actually, Your Honor, what we did is we said the Rule 50A motion went to all asserted claims. The JAMAL motion was made to all asserted claims. The footnote was the district court judge's footnote saying that we were not challenging on JAMAL. No, but I thought that you raised the claim seven thing only in a footnote. Yeah, and we raised all the claims in a footnote, and the judge took that to be that we were not pursuing. But we have plenty of cases in our courts saying you can't raise arguments in footnotes. Why can't the district court treat the motions before it the same way and say, well, you didn't raise it because it's just in a footnote? Your Honor, I think if she had addressed that, we'd have a different set of facts. I actually think that if you fairly read the record, there was just confusion as to whether we were asserting it. If you go back to the Rule 50A motions made during the course of the evidence, trial counsel had to make a decision based upon the manner in which the proof went in of what to do. And what they did is they asserted as to all asserted claims that there had been insufficient proof to go claim by claim and limitation by limitation. And if you go claim by claim and limitation by limitation, which is more than just, in our view, a question of form, these are substantive requirements which allow this court on appeal to determine whether the proof has been made. It also has very practical implications in the district court. When proof goes in in the fashion it did in this case, I'd like to come back to the 434 Patent Claim 30, which you've discussed. It's a very good example. Ms. Brooks has cited you to page 20009, which doesn't refer to a stepper motor. That page was not discussed by Mr. Causey at all. There is no testimony about this page at all. He didn't describe the concept of a stepper motor at all. And the question of whether something is in a structural equivalent for 112 paragraph 6 purposes cannot, should not be decided on the basis of a manual page that was never discussed with the jury. The two pages that Fresenius described to the court as a roadmap, which are A2003, I'm sorry, A203 to 204, which is from the jury charge, we went back and counted up the pages that are represented by those references. Setting aside duplication where the same reference is cited, it's over 1100 pages of which a tiny handful were ever mentioned during the case. And what about on that particular point? I think you make a good argument that Causey's testimony and this sort of generalized reference to the manual, which doesn't even identify a stepper motor, isn't sufficient. But what about Kelly's testimony, which can be read as saying that a heparin pump is just standard, and he's referring to this diagram from one of the patents. And that same patent refers to the heparin pump in that context as a stepper motor. Your Honor, there are several things to say about Mr. Kelly's testimony. The first thing is the portions of the testimony that they cite on the means plus function limitations at best said that there were devices that had those means. They never say what the means were. And when you have a means plus function limitation, as is true for the 434 patent, and there are at least three different means limitations that are an issue, you have to say what the structure is. You have to say that that structure was in the prior art. And Mr. Kelly didn't say that. The second thing as Mr. Kelly's testimony is, if you look at portions of the testimony that are cited to the court as suggesting that this all was in the prior art, one of the portions of the testimony cited to the court is an examination of Mr. Kelly about a figure in a patent that is indisputably not prior art. No, I understand that. As I read the testimony, the way it went, and that's the figures at 15818, he was asked whether these things shown in this figure were in the prior art, and he said yes. And it referred, one of the things in that figure is a heparin pump. So his testimony can be read as saying that heparin pumps were in the prior art, which seems perfectly obvious, right? You could read the testimony that way. The question then becomes, is the heparin pump, the microprocessor, and the stepper motor that's claimed, is it identical to that or is it equivalent to that? And the argument that Fresenius is making to the court is this. You have Mr. Kelly's testimony, which is not specific to the patent at all. It's certainly not specific to the limitation at all. And the argument that's being made is it's sufficient for Mr. Kelly to say there were heparin pumps out there. It's insufficient to go to two pages of a manual that weren't discussed at all and say, even though it doesn't say microprocessor and stepper motor, that's really what they're talking about, and that's sufficient. Yeah, but I think here we're not talking about the manual. We're talking about Kelly's testimony about this page that I referred to, and let's assume that he's saying that the heparin pump shown here is common in all homodialysis machines. But on the previous page of the record, that heparin pump is referred to as a stepper motor, right? Right. Yes, Your Honor, but here's the reason they have to tie these two things together. You have Mr. Kelly's generalized testimony, right? And you then have the claim, and Mr. Causey testifying about the claim and limitations in particular. The reason that you have to say, okay, this is, Mr. Causey, you need to say, this is what I'm talking about for the 434 patent claim 30 is this. It's not just a question of whether the different components were out there in the prior art. It, in fact, is three different questions, which is, were the different components out there in prior art? Was there a reason to combine, to quote KSR? And then, if there was, could you make it work? And one of the problems with this generalized proof, and some of the things that have been cited to the court, is that the jury had no way of ever knowing whether you could take what Mr. Kelly was talking about and combine it with a touch screen of the 434 patent. No one ever put A and B up there so someone could say, was there a reason to combine them? Was it possible? When the court considers some of the pages, and if the court looks at Fresenius' opening brief at pages 21 to 26, which is where they go through the different elements of the different claims, what you will find is that the overwhelming majority of the citations are the pages of the manuals that were never discussed at trial. And in that context, you're asking the jury to engage in a task which this court has suggested even the trial judge should not have to do post-trial, which is hunt through the record, and a task this court has suggested it shouldn't do. And that's why when Ms. Brooks says that we're not contending there was a failure proof, we are contending there was a failure proof. I think where we disagree is this. We contend that you need to go claim by claim, limitation by limitation. We contend that it's not a matter of form, but it's a matter of substance, that that's what we have to do as lawyers before this court and as trial lawyers. But we also contend that you have to do it because neither the jury or the district court or this district court nor the patentee sitting there deciding whether to cross-examine or alternatively what proof to put on can know what you're rebutting unless you put it up there. And it's not a failure of proof in some form. It's a substantive failure to present evidence. And that's consistently what occurred. What you have now is Mr. Causey giving just generalized proof, a generalized testimony about key elements of certain of the claims. You have Mr. Ragsdale who testified from memory about a product that he was familiar with 25 years ago, never referring to the manual at all. And Fresenius now saying, well, you really can find the corroboration for his testimony there. You have Fresenius saying, even though Mr. Ragsdale testified only about one of the patents, the 027, this, Your Honor, is a little bit similar to the Mr. Kelly situation. They're saying that even though he testified about the Serotron as it relates to the 027 patent, you really, the jury could have applied that to the 434 and the 131. But Mr. Lee, you're not saying that the specifics have to be presented point by point by point. Can't they generalize it based upon the claim and the evidence that's submitted? Your Honor, I think it's, to answer your question, I think it's somewhere in between. I mean, is there a ritualistic, to quote Ms. Brooks, you have to do it precisely this way. I don't think any of us would say that there's one single formula. I think just a generalized presentation doesn't make it. And the reason that generalized presentation doesn't make it is precisely the reason that J. Mull was granted by the district court. There are, taking the 027 patent or the 434 patent, there isn't a generalized limitation A that says hemodialysis machine. Instead, it describes specific apparatus with specific limitations. And I do think, I do think what this court's jurisprudence says is you have to make the case and say, limitation A is here, limitation B is there, limitation C is here. And there was a reason to put them together. So I guess my answer is closer to your latter than to your former. I don't think generalized testimony does it. And I think this is, quite honestly, a good example. Because if you go to what they call the roadmap at pages 203 to 204, that's not a roadmap that would be of any use to a jury. That is just 1,100 pages of manuals that went back into the jury room. And the jury would have to dig to find this reference to a stepper motor. Can you cover that up with specific instructions from the court as to the evidence that's been submitted and what evidence needs to be considered by the jury? Would that be sufficient? You could. But I don't think that the charge that's at page 203 and 204 does that in this case. And I think perhaps the best indication we have that the trial judge herself did not think she did it is, when she walked through limitation by limitation, claim by claim, she found failure of proof. This is not a trial judge who went back in and made credibility determinations and her own factual determinations. What she did is she thought this court had defined a protocol, a set of steps that needed to be followed. She was following those steps, claim by claim, limitation by limitation, and she concluded that there was an absence of proof on those limitations, and in that we think she was correct. I'll tell you what the problem is. You look at the trial transcript. It looks as though the big issue at the trial was whether the addition of a touch screen was non-obvious or was obvious. And that the issues, there weren't really any issues about these other limitations being found in the prior art or there being a motivation to include them in a homodialysis machine. And so that's what's troubling about this is that we do have this rule that you've got to go and show that each element is present, there's a motivation, but this doesn't seem to be what this case was about when it was tried. Your Honor, I anticipated that question, and I think the answer is this, and it is a question of what happens during the course of the crucible of the trial, which is if you are the patentee and someone's challenging the validity of your patent and the proof goes up, and hypothetically we're in a situation where you think that the defendant has not made their proof on element by element, or that they have, and it happens, and I think this court has seen it, there's been a document dumped which you don't think makes the proof. You have a very difficult decision to make. You can decide to do nothing and let the proof sit and make your Rule 58 motion. That's what counsel did here. They made their Rule 58 motion. They renewed it at Rule 50B, and the district court believed they were correct. The second thing you can do is you can decide to cross-examine and guess at where they're finding the different things and go after that, but that's a hard tactical decision because there are a thousand pages to cross-examine on. You don't know what to pick and choose, and quite candidly, you can make the situation worse for yourself. Well, I understand the trial tactics part of it. Yeah, but I think that having been confronted with that, it's a hard decision. The parallel, Your Honor, is if they point to page 12 in the manual, and that's all they point to, and you know at page 20 there's something that could be more troublesome, do you take it on or do you let it sit? Counsel here decided to let it sit. They made their Rule 58 motion, and I think that we suggest that the district court reach the correct conclusion in granting the JML motion. But it wasn't just pointing to pages. Isn't this where the role of the experts becomes very important in terms of particularly with complex technology and filling these gaps that we're talking about? I agree, Your Honor. I think that that's why this is a case where we've portrayed it to you differently, to some extent presenting us more simply than we have. This is a complicated technology. The court, in fact, described it as complicated. There was a tutorial given by Mr. Kelly that described the complications, the really sensitive parameters of the machine, and the benefits of a touchscreen to do that. And then against that backdrop, what the district court was saying is because it's complicated, we need an expert to explain to us where is it that you find the stepper motor? Where is it that you find this means for dealing with dialysate concentration? To address briefly the cross appeal, moving beyond the question I've already addressed with Judge Dyke, if you look at Claim 7 of the 027 patent, where is it that you find nonconductivity data for a particular dialysate? Where is it that you find, for Claim 7 Part B, conductivity data that is computed from nonconductivity data? But wasn't Mr. Ragsdale's testimony the effect that there was conductivity control system, that there was a control system for conductivity? Your Honor, I think if you gave it its most generous reading, you could read it that way. And I think this is the way it breaks down into three parts. The first is, if you give it that reading, which Fresenius has, this is his testimony about what a machine did 25 years ago. He didn't point to a single page of the manual. Today, moving to Part 2, Fresenius points you to two parts of three pages of the manual. They're really instructive, and I think they demonstrate the reason that claim by claim, limitation by limitation, is the rubric that we should all operate within. And here's the reason. When you go to those three pages, what you find is that for 80% of the different dialysates, they just assign the same number. There is no particularized determination for a particular dialysate. For another 20%, that portion of the manual directs you to engaging in these really complicated computations by hand, by the nurse or the operator, precisely the thing that the 027 patent was intended to avoid. And then thirdly, Your Honor, when you get to it and you look at those pages, in fact, what Mr. Ragsdale describes as non-conductivity data turns out to be conductivity data, defined in moos or ohms, depending on one the inverse of the other. And it's not particular to any dialysate. Indeed, the formula they cite for you today has a B or a beta. That is a measure of conductivity. Their two pages, the only thing that would corroborate Mr. Ragsdale on Claim 7, actually demonstrate just what the prior art did and just what the advantage of Claim 7 of the 027 patent is. Rather than, as their manual describes, requiring in many instances very complicated and cumbersome and error-prone computations by the operator, rather than failing to distinguish by particular dialysate the conductivity data, rather than computing conductivity data from non-conductivity data, they did it the old-fashioned way. Claim 7 of the 027 patent did it the new way. And if you follow the analysis of the district court on all the other claims, you apply it to Claim 7, it's clear that there was a substantive failure of proof. It's actually even clearer in this circumstance because the very proof they cite to the court is what the prior art did. One of the things Mr. Ragsdale cited in that portion of his testimony was sodium concentration, but sodium concentration was not non-conductivity data specific to a particular dialysate. In fact, if the court considers those pages, you will see that it's just generic sodium concentration information. So I think what you would have to do is test Mr. Ragsdale's very generalized testimony. And even if you give it the generous reading that Your Honor has, if you go to the three pages that Trotsenius has cited, they actually show that they're doing the opposite of what we're claiming. Could I ask you one other question here? Sure. Let's assume that as a result of the re-exam here that all these patent claims are held to be invalid and not sustained on appeal. So at the same time, let's assume that we hypothetically uphold the injunction here. Does the injunction then get vacated once the patents are held invalid? Yeah. Your Honor, let me say two things. First, to clarify, in the 434 and the 131, they are before the board on appeal right now. That's what they said. The answer to your question, Your Honor, is I think that's an unanswered question. Well, what's your view? That's why I'm asking. I think my view in a broader sense is that if you divide the world into the judgment for what has happened retrospectively, so that if there's a damages award that has been awarded- There's no way to undo the damage award. There's no way to undo it. The damage award is a damage award going back in time. If you were in a circumstance where you emerge from re-exam and every single claim of every single patent, all 14 of the claims stood finally rejected after all appeals, then the injunction would be a problem. The in-between- Would be vacated. Yeah. I think that's correct. If the in-between is, what happens if claims emerge that are- Some are the same, but some are different. Some emerge, some don't. It's a gray area that I don't think the court has addressed. Thank you, Your Honor. Thank you, Mr. Lee. Ms. Brooks? Thank you, Your Honor. Just very briefly, I'd like to address the two questions that the court asked Mr. Lee regarding if the court were to assume hypothetically that it would have been obvious to put a touchscreen on a hemodialysis machine what claims are remaining. And Mr. Lee's response was that it would be the 027 Claim 7 and the 434 Claims 26, 30, and 31. First of all, as to the 027 Claim 7, as Your Honor pointed out, it was raised in the JMAL in a footnote, and it was simply done in the context of that Mr. Ragsdale's testimony was not sufficiently cooperated, not that the serotron was not invalidating or anticipatory prior art. Based on that, the court in the JMAL order at footnote 1 said the following, Baxter does not challenge the jury's verdict that claims 7, 14, 15, and 16 of the 027 patent are invalid as anticipated by prior art. Baxter never told the court, yes, we do. Baxter left it at that, and in fact, when we had the second trial after the entry of JMAL on damages, Baxter again affirmed that they were not challenging the jury's verdict of anticipation on the 027 Claim 7. So we submit it's not properly before the court, and it's not properly on cross-appeal, and all that discussion about what is or is not non-conductivity data is irrelevant. However, Mr. Ragsdale did testify clearly and unequivocally at trial that the serotron did in fact have a controller in which you could submit non-conductivity data, and the manual we submit supports Mr. Ragsdale. There is no expert testimony to the contrary. There is simply attorney argument in Baxter's brief that should not have been filed in the first place. But once again, that's a pretty broad support. You'd have to go back and check the manual itself in order to find support for Mr. Ragsdale's statement. That's correct. It's not as if he points to the specific portion of the manual that supports his position. That's correct. He did not. What he did do was base it on his own hands-on experience that he clearly remembered even after 25 years. Twenty-five years earlier. It was a very important machine, which was sitting right in front of him at the time of his testimony. And just to deal very quickly with Claim 434, the 434 patent claims 26, 30, and 31. Those, Your Honor, are the ones that we've been discussing actually at length. And Mr. Kelly, Baxter's inventor, admitted that all hemodialysis machines must have a pump to circulate the dialysate. Mr. Kelly admitted that all hemodialysis machines must have a means for controlling the dialysate parameter selected from a group consisting of temperature and concentration, and that these all existed before his work on the System 1000. In addition to that, his admissions are supported by the prior art that was sitting in the courtroom, and Mr. Kelly did talk about that. Mr. Kelly specifically admitted that the Serotron was the first computer-controlled hemodialysis machine, indeed had a microprocessor in there, and indeed had pumps. And we don't have to have the exact structure, simply equivalent structure, which the code manual makes very clear, not somewhere 1,000 pages in, within the first three pages, and actually even has a photograph of the heparin-driven syringe that is driven by both the pump and the motor. The same applies to Claims 30 and 31. We again have the admissions of Mr. Kelly, that he has been, hemodialysis machines have been using heparin, quote, for as long as I've been in dialysis. And again, we have the exact same corroboration that is contained in the manuals that were discussed with the jury at length. And in Claim 31, we again have the manuals, the Serotron modeling programmer, which was, that specifically was discussed by no less than three different witnesses. So, thank you, unless the court has any other questions. Okay, thank you, Ms. Bates. Thank you. Ms. Lee, the case is taken into submission. Thank you. All rise. The honorable court is adjourned until tomorrow morning at 10 a.m.